**Denis P. McAllister**
**Attorney at Law**
**(NYS Bar# 2508182)**
**70 Glen Street, Suite 395**
**Glen Cove, New York 11542**
**Tel.# (516) 816-6644**
**email: Kogid67@aol.com**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

------------------------------------------------------------X

COLLEEN PETERS,

                Plaintiff,

                                      Case No.:

      -v.-

Merrick Garland, in his official capacity as
Attorney General of the United States,
DEPARTMENT OF JUSTICE, and
Christopher Wray, in his official capacity as
Director of the FEDERAL BUREAU OF
INVESTIGATION,

                Defendants.

------------------------------------------------------------X

### PLAINTIFF'S COMPLAINT FOR INJUNCTIVE & MANDAMUS RELIEF

Plaintiff, COLLEEN PETERS, ("Plaintiff"), complains and alleges as follows:

### I.  JURISDICTION

1.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's

causes of action arise under the Constitution and laws of the United States, and under 28 U.S.C.

§ 1361 because the Plaintiff seeks *writs* of mandamus to compel officers and employees of the

United States and its agencies to perform duties owed to Plaintiff under law, and

Plaintiff seeks equitable relief in exoneration of her denial of due process under the

Fifth Amendment's Due Process Clause, because her termination was taken without lawful

authority and in violation of explicit procedural protections, as such she seeks declaratory relief

under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

2.      Sovereign immunity for non-monetary relief is waived by 5 U.S.C. § 702, and by the fact

that Defendants acted unconstitutionally and beyond statutory and other lawful authority.

## II.  VENUE

3.      Defendant Federal Bureau of Investigation maintains its Executive Headquarters at the J.

Edgar Hoover Building, which is located in the District of Columbia and a substantial part of this

Defendants' actions and omissions giving rise to the Plaintiff's claims of economic and non-

economic injuries arose in the District of Columbia. Therefore, venue is proper in the District of

Columbia pursuant to 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1391(e)(1).

## III.  PARTIES

4.      Plaintiff is an adult citizen of the United States and a former employee of the Federal

Bureau of Investigation, a component within the Department of Justice. Plaintiff was

employed by the FBI as an agent from April 11, 2021 to April 11, 2023[1].

        Plaintiff resides at ███████████ Bellevue, Nebraska.

5.      Defendant, Merrick D. Garland, is the Attorney General of the United States and cabinet

---

1  The Plaintiff was notified that the effective date of her termination was upon her receipt of a Termination Letter that was hand delivered to the Plaintiff on **April 11, 2023**, in the afternoon of Plaintiff's work day. However, Defendant FBI records reflect that administrative action was not taken to serialize Plaintiff's termination until April 12, 2023. This difference of dates April 11, 2023 versus April 12, 2023, is not outcome determinative to Plaintiff's claims for relief.

Head over the U.S. Department of Justice and has his office situated in the District of Columbia. Defendant Merrick Garland is sued only in his official capacity.

6.     At all times mentioned herein, the Department of Justice, is an Executive Department and "agency" within the meaning of 5 U.S.C. §101, with its principal offices in the District of Columbia.

7.     Defendant Christopher Wray, serving as Director of the Federal Bureau of Investigation has his principal office in the District of Columbia and the Federal Bureau of Investigation is an Executive Agency within the meaning of 5 U.S.C. §105. Defendant Christopher Wray is sued only in his official capacity.

8.     Defendant Federal Bureau of Investigation (Defendant FBI) is a subordinate component of the Department of Justice pursuant to 28 C.F.R. § 0.1. While Defendant FBI maintains 56 Field Offices across the United States, its principal office is located in the District of Columbia.

## IV.   FACTUAL ALLEGATIONS

9     Paragraphs 1 through 8 are incorporated herein by reference as though fully set forth herein.

10.     At the time of the acts of alleged unlawful conduct by the Defendants the Plaintiff was an employee of the federal Government, as that term is defined in 5 U.S.C. §2105(a)(1), employed in the excepted service, as that phrase is defined in 5 U.S.C. §2103(a).

11.     On March 28, 2021 Defendant FBI issued a top secret security clearance to the Plaintiff as a prerequisite to her ability to perform her special agent duties.

12.     On April 11, 2021, Plaintiff entered on duty with Defendant FBI in the special agent series (GL-1811-10), at New Agent Training Academy in Quantico, Virginia and on that date presented

herself to her first-line supervisor reporting "ready, willing, and able" to perform all the requisite duties of the special agent position. Agents serving during their probationary period are often referred to as new agent trainees (NATs).

13.    Plaintiff successfully completed the Basic Field Agent Training Course (BFTC) at Quantico, Virginia and was given a field office assignment. Plaintiff was part of BFTC class of agents identified as **BFTC 21-03**.

14.    As a NAT with Defendant FBI, the Plaintiff was given, as her first duty station, the Omaha Field Office. The Plaintiff was hired into an excepted service position as a GL 1811-10 and was required to serve a two (2) year probationary period, from her entry on duty date (EOD).

15.    Upon arrival to the Omaha Field Office during the first week of September of 2021, the Plaintiff was assigned to the Division's Joint Terrorism Task Force (JTTF), whose operational title was "OM-5".

16.    Consistent with Defendant FBI's New Agent Development Program Policy Guide (NADPPG) and FBI practice, upon arrival in Omaha, Plaintiff was assigned a Field Training Agent (FTA) by the OM-5 supervisory special agent (SSA) to mentor Plaintiff in her professional development in the Agent series and for Plaintiff's successful completion of the New Agent Development Program (NADP).

17.    During this Plaintiff's time as an NAT, the NADPPG required an SSA to:

    -assign an FTA to all NATs under their supervision, during their probationary period;

    -oversee each NAT's proper development, and facilitate the NAT's completion of all NADP requirements;

    -work with the NAT's FTA to ensure that the NAT is getting proper experience and training;

-Document and assess each NAT's suitability for continued employment with the FBI;

-Discuss suitability performance with each NAT during the NAT's 60-day file review and 90-day performance check-ins;

-Verify completion of developmental experiences in the NADP logbook;

-Ensure that the NAT has met all requirements for promotion to the GS-11 level, before submitting a completion of program EC (aka electronic communication) in Sentinel;

-Prepare the promotion certification documentation and submit to the FBIHQ division or Field Office front office for approval, when required.

18.     During this Plaintiff's time as a NAT, the NADPPG required an FTA to:

-Oversee an NAT's training and development by engaging the NA in mentoring relationship;

-Contact the NAT as soon as practicable and clearly set expectations for the NAT, in coordination with the SSA;

-Assist the NAT's overall adjustment to the demands of the job and office culture;

-Facilitate the NAT's completion of all NADP requirements;

-Assist the NAT in identifying developmental exercises for the NADP logbook;

-Participate in the NAT's file reviews, performance check-ins, and wrap-ups, as appropriate;

-Provide feedback to the SSA on the NAT's performance throughout the program;

-Review the NAT's documentation and written communications prior to submission, as appropriate.

19.     During this Plaintiff's time as a NAT, the NADPPG required, each Field Office (FO) New Agent Development Program Coordinator (NAPD/C) to:

-Manage the NADP in his or her FO;

-Update the NAT tracking system with the NADP requirements for the FO;

-Oversee the NAT's development by providing training and opportunities to complete NADP requirements in the FO;

-Organize or facilitate NAT trainings in human intelligence (HUMINT), interviewing and interrogation, and case management in the FO to meet the NAT's NADP core training requirements; and

-Complete all other NADP-related actions in the FO, as directed by the NADP Program Manager2.

20.     During all relevant times in this cause of action, Defendant FBI's Omaha FO had an administrative agent who held the title of NADP/C and that was agent Michele Stevenson (NADP/C Stevenson).

21.     During all relevant times in this cause of action, Defendant FBI maintained a digital database (or subfolder within an otherwise existing database) known by the label of Virtual Academy, in which each NAT's professional accomplishments were registered to reflect the progression of certain mandatory core training completions and for other investigative achievements by NATs.

22.     The individual NATs' Virtual Academy contains an "NADP Logbook". The Logbook gets updated as the NAT completes various law enforcement achievements (i.e., making an arrest, developing an individual as a confidential human source, presentation of criminal charge requests to the Office of the United States Attorney, etc.), and the mandatory core training.

23.     As part of the NADPG each NAT must complete three mandatory core trainings:

_____

2 Program Manager (PM) is a reference to the PM at the FBI Training Division based in FBI Headquarters.

-HR-2801: Human Intelligence;

-HR-2811: Case Management; and

-HR-2822; Interview and Interrogation.

24. Pursuant to the NADPPG, the Training Division's New Agent Development Program will accept a Logbook that reflects 93% completion by the assessment due date3, with an understanding that 100% of the Logbook will take place as soon thereafter as practicable (beyond the assessment due date).

25. Plaintiff's 60-day file reviews were reviewed by the SSA over OM-5 and went through an additional level of supervisory review at the level of the Assistant Special Agent in Charge (ASAC) who holds responsibility over the National Security side of the Omaha FO. During all relevant times in this cause of action, the National Security ASAC was Willie Johnson (ASAC Johnson).

26. ASAC Johnson historically serialized his written comments/guidance regarding Plaintiff's 60-day file reviews within sixty (60) days after the close of the file review period.

27. Performance "Check-ins" are periodic informal assessments of an FBI agent's performance from Field Office management, which are not required to be provided to agents, nor NATs on any recurring basis.

28. Performance "Wrap-ups" are official performance assessments of record within the FBI and Field Office management maintain Wrap-ups in an agent's Official Personnel Folder (OPF) and in the event of an NAT, are shared by the FO with the FBI Training Division.

29. Plaintiff received her first Performance Check-in on December 15, 2021, when the OM-5 SSA rated her as a Consistent Performer and ASAC Johnson acted as the "reviewing official" for this Check-in. This Check-in contained representations that Plaintiff "has done an outstanding job

---

3 The assessment (of the NA) due date generally arrives at the 18-month mark in the FO and also marks the juncture when an NA is approved for promotion to the grade 11 level in the 1811 occupational series.

finding opportunities to get involved in existing JTTF investigations as well as supporting several IT (International Terrorism) investigations being worked by other squads", "[Plaintiff] has opened one new CHS during this review period, who has potential to report on IT matters in the OM AOR" and "Great job, keep it up!".

30.    Plaintiff received her second Performance Check-in on April 27, 2022, when the same OM-5 SSA rated Plaintiff as a Consistent Performer and, again, ASAC Johnson acted as the reviewing official for this Check-in. This Check-in contained representations that "[Plaintiff] has excelled since arriving here as a new agent in September...making significant progress on completion of the NAT logbook, which is approximately 65% completed. [Plaintiff] has led a significant WMD (Weapons of Mass Destruction) investigation, which included utilizing several search warrants on subjects residence and facilities as well as numerous interviews to support investigation, leading to the arrest and indictment of subject".

31.    On November 22, 2022, Plaintiff received her only official performance rating of record as an NAT with the Omaha FO, when her Performance Wrap-up was published by the same OM-5 SSA, with ASAC Johnson acting as reviewing official on this official performance rating.

32.    In the body of the November 22, 2022 Wrap-up, the SSA represented that "[Plaintiff]'s performance for the year justifies the rating of exemplary performer. She regularly executes her duties at a level above her current level of GS-10. During this review period {Plaintiff} has displayed determination, excellent attention to detail, and a willingness to do whatever the demands of the JTTF require", "[Plaintiff] has made excellent progress on her new Agent probationary requirements. As of the writing of this document, she has completed 91% of the requirements. She is on schedule to have it completed ahead of the April 2023 deadline", and "[Plaintiff] recruited four confidential human sources".

33.     In October, 2022, after close of the fiscal year rating cycle, a new supervisor was appointed over the JTTF (i.e., OM-5), while the National Security ASAC (ASAC Johnson) remained the same.

34.     In October of 2022, Supervisory Special Agent Kari Gallagher (SSA Gallagher) became the supervisor over OM-5. SSA Gallagher became a direct report to ASAC Johnson.

35.     In November of 2022, Plaintiff's assigned FTA was escorted out of the FBI Omaha FO and did not return back to Omaha until the late spring of 2023. From November of 2022 until Plaintiff's last day of work on April 11, 2023, neither SSA Gallagher nor NADP/C Stevenson assigned a successor FTA to mentor the Plaintiff, nor provide the assistance and guidance to Plaintiff, as per the NADPPG.

36.     On February 13, 2023, NADP/C Stevenson sent an email to Plaintiff with a subject line that read "Completion of logbook". The substance of NADP/C Stevenson's email read as follows:

> Hi Colleen,
> I received your IM about your logbook. There is nothing left for you to do to complete the logbook. Once the EC is drafted by your supervisor, it will be signed off through the chain of command and then the NADP unit actually finalizes your logbook. The EC is not technically due until March 1st and your promotion eligibility date is April 9th[4].
>
> I know (sic) it's exciting to be through with your probation and to receive your promotion, please know that everyone who is involved in that process is aware and working on getting you to the finish line........
>
> Michele".

37.      SSA Gallagher did not provide any Performance Check-ins for this Plaintiff during the month of December of 2022, nor during the months of January, February, nor March of 2023. Despite SSA Gallagher signing off on Plaintiff's case file reviews that covered all of these months.

---

4 April 9, 2023, is the start of the pay period during which Plaintiff's 2-year EOD anniversary falls. As per federal statute, and OPM regulations, this is the pay period during which Plaintiff's pay grade would have been elevated from GL-1811-10 to GL-1811-11 (i.e., promotion).

38.     March 1, 2023, was a deadline established by FBI Training Division for the FO SSAs and/or NADP/Cs to assure that the Probationary Completion ECs were submitted to the Training Division from their respective FOs for the NATs graduates of agent class **BFTC 21-03**.

39.     During the months of February and March of 2023 Plaintiff made diligent inquiry with SSA Gallagher and NADP/C Stevenson regarding the status of her employment and Probationary Completion EC, as she had already completed all of the core trainings and law enforcement investigative steps for Logbook completion.

40.     On March 2, 2023, the Training Division sent an email to the NADP/Cs for each FBI Field Office that had an NAT from BFTC class 21-03 who had not yet sent a Probationary Completion EC by the March 1, 2023, deadline. Carbon copied and included on the email were the SSAs who were the supervisors of record for the NATs in each FO.

41.     NACP/D Stevenson and SSA Gallagher were both sent the above-referenced March 2, 2023 email from the Training Division. Furthermore, the March 2, 2023 email, identified a total of fifteen (15) NATs, whose Probationary Completion ECs had not been received by the Training Division by the March 1, 2023 deadline.

42.     This March 2, 2023 email from the Training Division contained a table with the name of each NAT and identified their respective FOs, and bore tables to reflect what the Training Division's records reflected as to which core trainings, if any, were yet to be completed and percentages of Logbook completion for each NAT.

43.     According to the tables in the Training Division's March 2, 2023, email the Plaintiff was missing no items, pursuant to the NADPPG, except the Omaha Field Office Probationary Completion EC. Of the 15 NATs, Plaintiff was one of only three (3) NATs who reflected 99% completion of their Probationary Logbook. The remaining 12 NATs had some percentage less than

99% Logbook completion.

44.     The March 2, 2023, table embedded in the Training Division email reflected that Plaintiff had completed 100% of her core Training for the NADPPG. The remaining 1% of the Logbook completion required affirmative steps by SSA Gallagher, ASAC Johnson and the Omaha Special Agent in Charge, Gene Kowel (SAC Kowel).

45.     On March 13, 2023, SSA Gallagher sent an email at 3:32 p.m. to Plaintiff, which contained a subject line that read "Sign and Return" and the body of the email (in its entirety) read:

> "Colleen,
>
> Sign the attached document and send back by COB".

46.     SSA Gallagher's March 13, 2023 afternoon email contained an attachment. The attachment had a heading that read "Suitability Standards for Probationary Employee" (hereinafter the "Suitability Standards"). The said attachment identified six (6) numbered dimensions that may serve as a basis for probationary removal. Namely, #1 "Conscientiousness", #2 "Cooperativeness", #3 "Emotional Maturity", #4 "Initiative", #5 "Integrity and Honesty", and #6 "Judgment".

47.     The Suitability Standards form sent to Plaintiff was a 2-page document, which contained no signature line or date line, nor indicated a place and date for any witness to observe the recipient's acknowledgment of receipt. Plaintiff believes that March 13, 2023 was the first time that she had ever been delivered the Suitability Standards.

48.     March 13, 2023, was the first time during her 17-months in the Omaha FO that management and/or the NADP/C had generated any documentation which reflected any doubts, questions, or concerns about Plaintiff's "suitability" to continue as an agent in the FBI.

49.     Defendant FBI failed to comply with the NADPPG, which required that the SSA:

> "-Document and assess each NAs suitability for continued employment with the FBI;

-Discuss suitability performance with each NAT during the NAT's 60-day file review and 90-day performance check-ins".

50.     On April 10, 2023, a Performance Check-in was filed for this Plaintiff, which represented that Plaintiff's overall performance warranted a rating of "Inconsistent Performer" and was published by personnel from Defendant FBI located at the J. Edgar Hoover Building in the Performance Appraisal Unit (PAU).

51.     The April 10, 2023, Performance Check-in contained multiple spurious and even false representations authored by the rating official (SSA Gallagher) and reviewing official (ASAC Johnson). Plaintiff received the notification of the existence of and substance of an April 10, 2023, Check-in some time on that same day; which was a Tuesday.

52.     Furthermore, the April 10, 2023, Check-in contained a directive to Plaintiff to complete a Virtual Academy class identified as "WBT-5141-Professionalism, Business Etiquette, and Personal Accountability", along with a further directive for this Plaintiff to provide the certificate of completion to the SSA Gallagher.

53.     On that same day, Tuesday, April 10, 2023, Plaintiff attended in the Virtual Academy class WBT-5141 and forwarded the certificate of completion generated by Virtual Academy to SSA Gallagher.

54.     Plaintiff worked a complete work day on Tuesday, April 10, 2023 and at the completion of her tour of duty on April 10, 2023, Plaintiff became a tenured FBI employee.

55.     On April 11, 2023 Plaintiff returned to work at Omaha FO and began her traditional work duties as an agent for OM-5.

55.     Around midday (12:00 hours) on April 11, 2023, or shortly thereafter, Plaintiff was summoned to meet with SAC Kowel in the Omaha FO Executive Management Suite. At that time,

SAC Kowel handed Plaintiff a letter marked "PERSONAL" in the upper-right hand corner, which

bore a date of April 10, 2023, and had a digital signature by the Assistant Director over the Human

Resources Division (HRD) named Michael Schneider (hereinafter referred to as the April 11, 2023

"Termination Letter").

56.     The April 11, 2023 Termination Letter was three pages in length and represented that

enclosures were attached to the document. Plaintiff read the contents of the Termination Letter,

silently, to herself. It was addressed to Plaintiff at the Omaha FO and read as follows:

> "Dear Ms. Peters:
>
> This letter is to advise your employment with the Federal Bureau of Investigation is
> terminated for failure to meet the suitability standards. This action is taken during the
> probationary period of your position as Special Agent, GL-1811-10-110001, with the
> Omaha Field Office. Your termination is effective upon receipt of this letter.
>
> Please be advised appeal rights are not available to employees removed from a position
> during the two-year probationary period for conduct, suitability, and/or performance
> issues.
> ……………………………………………………………………………………..
>
>                     Sincerely,
>
>                     /s/ Michael H. Schneider
>                     Acting Executive Assistant Director
>                     Human Resources Branch".

57.     Plaintiff signed the second page of the Termination Letter, which bore a space identified

as "Acknowledgement of Receipt" and an area immediately to the right, for the Date. After affixing

her signature to the Termination Letter, Plaintiff wrote 4/11/23; the date on which she was

delivered the Termination Letter.

58.     The Termination Letter (which consisted of 3 total pages) contained instructions to the

Omaha FO on how to request PAU to take action on Plaintiff's termination in the form of an

SF-52, Request for Personnel Action.

59.    On April 12, 2023, Assistant Director Michael Schneider published an SF-50 Notification

of Personnel Action, which identified Plaintiff as the individual for whom the personnel action

was requested, the Nature of the Action reflected "Termination During Probationary/Trial Period"

and the SF-50 contained an approval date by AD Schneider of April 12, 2023 and an effective date

of April 11, 2023.

60.    The SF-50 also referenced (in box #5) the "Legal Authority" for the personnel action

pursuant to Office of Personnel Management (OPM) regulations. The cited regulation was

REG.315.804. This is a reference to Part 5-Career Conditional Employment section of the OPM

regulations.

61.    5 C.F.R. § 315.804, Termination of probationers for unsatisfactory performance or

conduct, reads:

> "(a) Subject to § 315.803(b), when an agency decides to terminate an employee serving a
> probationary or trial period because his work performance or conduct during this period
> fails to demonstrate his fitness or his qualifications for continued employment, it shall
> terminate his services by notifying him in writing as to why he is being separated and the
> effective date of the action. The information in the notice as to why the employee is being
> terminated shall, as a minimum, consist of the agency's conclusions as to the inadequacies
> of his performance or conduct.
>
> (b) Probation ends when the employee completes his or her scheduled tour of duty on the
> day before the anniversary date of the employee's appointment. For example, when the last
> workday is a Friday and anniversary date is the following Monday, the probationer must
> be separated before the end of the tour of duty on Friday since Friday would be the last day
> the employee has to demonstrate fitness for further employment".

62.    Plaintiff's probationary period ended at the end of her tour of duty on Tuesday, April 10,

2023. Defendant FBI attempted to terminate Plaintiff on the afternoon of April 11, 2023, when it

delivered the Termination Letter to Plaintiff.

63.    Since the Defendants' termination action appears to be in the nature of a Chapter 43 (5

U.S.C. § 4301 et seq.) adverse personnel action as opposed to a Chapter 75 action (5 U.S.C. §§

7503(b), 7513(b), the Defendant FBI was required to provide the procedural notifications to this Plaintiff. This is so, even while Plaintiff concedes that the Congress deliberately did not provide a right of judicial or administrative review of this performance personnel process. *United States v. Fausto*, 484 U.S. 439, 446 (1987).

64.     In this adverse personnel action (Plaintiff's dismissal), she was entitled simply to the opportunity to clear her name with the Defendants, via advance notice of charges and an opportunity to refute them. *Doe v. Dep't of Justice*, 753 F.2d 1092, 1112 (D.C. Cir. 1985). Plaintiff was never afforded such opportunity by these Defendants.

65.     By falsely treating AD Schneider's April 11, 2023 Termination Letter as if it had legal effect, Defendants have harmed Plaintiff by denying her due process, damaging her reputation, depriving her of her lawful status as a tenured FBI agent in good standing and eliminating her sole source of income, including stripping Plaintiff of retirement deposits and other corresponding remunerative benefits.

66.     As a valued public employee Plaintiff held a constitutionally protected property interest in her continued employment and her stellar professional reputation. The effect of this unconstitutional termination has stigmatized this Plaintiff from seeking a career in federal law enforcement with a different Federal agency.

67.     Per established FBI Policy and practice, Plaintiff enjoyed certain procedural safeguards to allow her to be given notice, the right to an attorney, right to review materials relied upon and a meaningful opportunity to respond to allegations of lack of suitability.

68.     In this case, Defendants published a spurious Performance Check-in on April 10, 2023, which represented (for the first time) that Plaintiff lacked "suitability", one (1) calendar day before her termination from the FBI. This is not due process.

## VI.    CLAIMS FOR RELIEF
## FIRST CLAIM FOR RELIEF

**Plaintiff's Termination Was a Legal Nullity, or Alternatively, Was *Ultra Vires*
Agency Action in Violation of the Fifth Amendment's Due Process Clause.**

69.    Paragraphs 1 through 68 are incorporated herein by reference as though fully set forth
herein.

70.    The Defendant FBI's April 11, 2023, delivery of the Termination Letter signed by AD
Schneider was not a valid Probationary Termination action, as it purported to take legal effect at a
time when Plaintiff was no longer serving in a probationary status, but a tenured employee of
Defendant FBI.

71.    Additionally, the April 11, 2023, termination attempt was *ultra vires* agency action that
violated the Fifth Amendment's Due Process Clause. More particularly, Defendants actions
deprived Plaintiff of her protectable property interest in her continued employment, without due
process of law.

72.    Under applicable federal law, policy, practice, a career civil servant who completes her
work obligations and departs from a probationary status is entitled to the Fifth Amendment's Due
Process Clause prior to being subjected to an adverse personnel action such as dismissal (aka
termination) from the federal rolls.

73.    Based on Defendant FBI's own internal disciplinary process and procedures, Defendant
FBI established procedural protections and guidelines prior to the institution of dismissal actions
against tenured employees, like Plaintiff.

74.    Plaintiff has a legitimate claim of entitlement to continued employment by virtue of
policies, practices, rules, and procedures promulgated and shepherded by Defendant FBI, as

reasonably understood by Plaintiff. See, *Loudermill v. Cleveland Board of Education*, 470 U.S. 572 (1985). See, also *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 579 (1972).

75.     On March 5, 1997, then FBI Director Louis J. Freeh (Director Freeh) promulgated Defendant FBI's disciplinary process under a memorandum captioned "Standards of Conduct Disciplinary Matters-Revision of the FBI's Disciplinary Process (hereinafter referred to as the *Freeh Memo*) and was disseminate to all 56 FBI Field Offices.

76.     Even though the *Freeh Memo* was in effect at the time that Plaintiff was hired by Defendant FBI, she understood that she had accepted employment in an excepted service position, which provided her very limited procedural protections towards her continuation in employment with the FBI.

77.     Nonetheless, Plaintiff was entitled to Defendant FBI's procedural protections for personnel actions up to dismissal (termination), based upon the promulgated *Freeh Memo* when accepting the agent position with Defendant FBI. The *Freeh Memo* has never been rescinded by Defendant FBI.

78.     The *Freeh Memo* created a structural reorganization [5] of Defendant FBI's internal processes for implementing disciplinary and adverse personnel actions of its human capital and procedural protections for tenured employees, as well as delegation of responsibility to varying FBI Headquarters Executive Staff for oversight into and responsibility for disciplinary and adverse personnel action processes.

79.     Under a section heading reading "Structural Reorganization of the Disciplinary Process", Director Freeh delegated agency responsibility as follows:

        "The authority to decide disciplinary action currently exercised by officials of the PD[6]  will

---

[5] The *Freeh Memo* created the current FBI's Headquarters component known as "Office of Professional Responsibility" (aka OPR).
[6] "PD" is an acronym for the former Personnel Division of the FBI.

be transferred to the newly constituted OPR. This change in the organizational structure of the disciplinary process will not alter the delegation of authority to Division/Office Heads in routine disciplinary actions which do not involve a suspension from duty without pay for more than fourteen days, demotion, or dismissal, or the adjudication of certain serious misconduct offenses.

80.     Further, under section heading "Structural Reorganization of the Disciplinary Process", Director Freeh delegated responsibility as follows:

> "OPR will be managed by an Assistant Director (AD) and Deputy Assistant Director (DAD)" and

> "The AD of OPR will manage overall investigative, adjudicative and training and administrative function of the Office and will have responsibility to decide disciplinary actions proposed by the DAD, OPR, or which are sensitive in nature".

81.     The *Freeh Memo* granted greater due process protection to tenured FBI employees than would otherwise exist, in its absence. Under a section heading labeled "Expansion of Procedural Protections in Personnel Actions", the memo reads as follows:

> "Any employee who is the subject to a proposed sanction of suspension without pay for more than fourteen days, demotion or dismissal, arising from the disciplinary process will be afforded the following procedural protections:
> (1) thirty calendar days' advance written notice of the proposed adverse action;
> (2) the opportunity to contract and use an attorney to assist in the disciplinary matter, subject to limitations imposed by law and regulation, which will be explained in writing to the subjects of OPR inquiries,…………………………………………………………………
> (3) an opportunity to review, upon written request made within ten calendar days of the above notice, the material which was relied on by the OPR official.………………………
> (4) an opportunity for the employee and his/her attorney to provide a written response to the proposed action.……………………………………………………………………………
> (5) fifteen days notice of a hearing in which the employee and his/her attorney may make an oral presentation to a senior OPR official, after submission of any written response but before action is taken…".

82.     Because Plaintiff was a tenured FBI agent (i.e., non-probationer) at the time that Defendant FBI attempted to terminate Plaintiff from the FBI on April 11, 2023, the designee for the dismissals from the FBI was the Assistant Director over OPR, not the Assistant Director over the Human Resources Division. As such, AD Schneider's attempted dismissal of Plaintiff was *Ultra Vires* and

of no legal effect.

83.    Neither SAC Kowel, nor AD Schneider were the Assistant Director of OPR on April 11, 2023, and as such, neither had delegated authority to terminate Plaintiff from the FBI. As such Defendants' termination personnel action was *ultra vires* and a nullity.

### SECOND CLAIM FOR RELIEF

### Mandamus for Officials of Department of Justice

84.    Paragraphs 1 through 84 are incorporated herein by reference as though fully set forth herein.

85.    The provisions of 28 U.S.C.§ 1361 provide a statutory basis for jurisdiction in cases seeking relief in the nature of *mandamus* against federal officers, employees, and agencies, and they provide for an independent cause of action in the absence of other available remedies.

86.    Defendants' actions, as set forth above, constitute an unlawful refusal to recognize Plaintiff as a tenured employee on April 11, 2023, and/or that Defendants' actions constituted an unlawful adverse personnel action.

87.    Plaintiff has a clear right to be recognized and acknowledged as having been a tenured (non-probationary) agent on April 11, 2023, and in good standing at that time, entitled to procedural protections afforded other tenured FBI employees under the auspices of the *Freeh Memo*.

88.    Plaintiff has a clear right to be reinstated as a GL-1811-11 agent of the Omaha Field Office, retroactive to April 11, 2023, vested with all of the rights and remunerative benefits she would have otherwise received in the absence of Defendants' unlawful actions.

89.    Defendants have a clear non-discretionary duty to deem Plaintiff as having not been legally dismissed from the FBI on April 11, 2023, or, alternatively, to rescind Plaintiff's unlawful

termination.

90.     If no other remedy is available through which Plaintiff can be properly recognized as a

tenured agent with Defendant FBI and the termination rescinded, then Plaintiff is entitled to relief

in the nature of *mandamus* compelling Defendants to recognize Plaintiff as a GL-1811-11, agent

of the Omaha Field Office, or to rescind the unlawful termination.

## VII.     PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff makes the following demand and prays this Court:

(a) declare that Plaintiff's termination was a legal nullity because Plaintiff had already
completed her probationary period at the time that the Termination Letter was tendered to
her by an officer of the Agency who did not have valid authority to terminate her
employment, or in the alternative, that Defendant FBI violated Plaintiff's constitutional
rights by terminating her employment contrary to her Due Process rights under the Fifth
Amendment of the United States Constitution;

(b) reinstate Plaintiff's employment as GL-1811-11, retroactive to the effective date of her
termination April 11, 2023, and as agent in good standing, with time in service credit so as
to allow Plaintiff to recover full law enforcement pay, healthcare insurance, and retirement
deposits;

(c) expunge Plaintiff's personnel file of all records related to Defendants' unconstitutional
termination decision;

(d) enjoin Defendants from engaging in reprisal and other illegal conduct in violation of
Plaintiff's rights;

(e) issue writs of mandamus to FBI Director Christopher Wray and his designees, as
appropriate;

(f) award Plaintiff's costs and an award of reasonable attorney's fees incurred in this action;
and under the Equal Access to Justice Act and 28 U.S.C. §2412(a) and (b);

(g) award Plaintiff all annual leave Plaintiff would have accrued during the period of time
from her termination until the date of her actual reinstatement;

(h) an award of pre-judgment and post-judgment interest; and

(i) any other such relief, including injunctive and/or declaratory relief, as the Court may
deem proper.

## VII.   FRCP (Rule) 11 CERTIFICATION

Under Federal Rule of Civil Procedure 11, by signing below, I hereby certify that to the best of my knowledge, information and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support, or if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Dated: July 13, 2024.

Respectfully submitted,

_____
Denis F. McAllister, Esq.
Attorney for Plaintiff